MILTON K. KANEKO, Plaintiff-Appellee, Cross-Appellant, *v.*
HILO COAST PROCESSING, a corporation, Defendant *v.*
MUTUAL WELDING, Defendant-Appellant, Cross-Appellee

NO. 7378

(CIVIL NO. 3652)

NOVEMBER 10, 1982

RICHARDSON, C.J., LUM, NAKAMURA, JJ.,
AND RETIRED JUSTICES OGATA AND MENOR,
ASSIGNED TEMPORARILY

## OPINION OF THE COURT BY OGATA, J.

This is an appeal by defendant-appellant, cross-appellee, Mutual Welding Co., Ltd. (hereinafter Mutual Welding or appellant), from a judgment and order denying Mutual Welding's Motion for New Trial or in the alternative for a Remittitur entered in the Third Circuit Court in favor of and for plaintiff-appellee, cross-appellant, Milton T. Kaneko (hereinafter Kaneko or appellee).[1] Appellee Kaneko cross-appealed that portion of the final judgment which reduced the jury award and from the order denying Plaintiff's Motion for Judgment Notwithstanding the Verdict or in the alternative to Amend the Judgment. For the reasons set forth below, we affirm the judgment and order of the circuit court.

The instant action resulted from injuries sustained by Milton Kaneko who fell while a mill building was being erected for Hilo Coast Processing in Pepeekeo, Hawaii.

Hilo Coast Processing Company seeking to erect several new buildings at its mill site in Pepeekeo, Hawaii, hired W. A. Hirai and Associates, an architectural design firm, to design and draft the plans for these buildings. After the plans were drafted and pursuant to the specifications contained therein, Mutual Welding manufactured and fabricated the mill building. Central Pacific Boiler and Piping was hired to erect the prefabricated building manufactured by Mutual Welding. Milton Kaneko was an ironworker employed by Central Pacific Boiler and Piping.

On this particular job, Kaneko was an ironworker who was responsible for connecting girts (steel beams in a horizontal position) to clips which were located on columns (steel beams in a vertical position). After each girt was connected, the ironworker would then climb higher on the column and connect the next girt by standing on the girt that had just been connected. On August 16, 1973, while Kaneko was in the process of connecting the third girt, some 10 to 20 feet in the air, the second girt upon which he was standing on came loose and as a result appellee fell to the ground. It was discovered

---

[1] Hilo Coast Processing was a co-defendant in the instant action but was found not to be negligent for any injury sustained by Milton Kaneko. Thus, Hilo Coast Processing was not made a party to this appeal.

that the clip to which the second girt had been attached had only been tack welded or in other words, welded temporarily until a full filler weld could be made.

Kaneko suffered injuries to his back from the fall which required two laminectomies (back surgery) to the L 4-5 disc region. Consequently, appellee is unable to perform as an ironworker again and can not do heavy lifting.

This matter came for trial on September 25, 1978. The jury returned its special verdict as follows on October 17, 1978:

1. Was Mutual Welding Negligent?    X ____ ____
                                    Yes     No

2. If so, was said negligence a proximate
cause of said accident of 8/16/73?    X ____ ____
                                      Yes     No

3. Is Mutual Welding strictly liable
to Plaintiff?    X ____ ____
                 Yes     No

4. If so, was such strict liability a
proximate cause of the accident
of 8/16/73?    X ____ ____
               Yes     No

5. Is Mutual Welding liable for
breach of warranty?    X ____ ____
                       Yes     No

6. If so, was said breach of warranty
a proximate cause of the accident
of 8/16/73?    X ____ ____
               Yes     No

7. Was Hilo Coast Processing
negligent?    ____ X ____
              Yes     No

8. If so, was said negligence a
proximate cause of said accident
of 8/16/73?    ____ X ____
               Yes     No

9. Was Milton Kaneko negligent?    X ____ ____
                                   Yes     No

10. If so, was said negligence a proximate cause of said accident of 8/16/73?

<u>   X   </u>  <u>     </u>
   Yes     No

11. If you have found more than one of the parties liable and that liability a proximate cause of the accident of 8/16/73 then make the following apportionment of liability for the accident of 8/16/73:

| | | |
|---|---:|---|
| Mutual Welding | 73 | % |
| Hilo Coast Processing | 0 | % |
| Milton Kaneko | 27 | % |
| TOTAL | 100 | % |

12. If you have found any of the Defendants liable then determine damages as follows:

    A. Special Damages

| | |
|---|---|
|       1. Medical Bills | $ 4,800.12 |
|       2. Loss of wages to date | $ 32,500.00 |

    B. General Damages

| | |
|---|---|
|       1. Pain and suffering | $123,000.00 |
|       2. Diminished earning Capacity | $201,500.00 |

<u>    /s/  John G. Baird    </u>
Foreperson

The trial court then entered judgment for Kaneko on November 6, 1978, and reduced the jury award to $264,114.08, proportionate to Kaneko's percentage of liability, allowed costs against Mutual Welding and dismissed appellee's action against Hilo Coast Processing on the merits.

Thereafter on November 14, 1978, Mutual Welding filed a Motion for New Trial or in the Alternative for a Remittitur. That motion was denied by the trial court on December 22, 1978.

Appellee Kaneko also sought post-judgment relief by filing on November 16, 1978, a Motion for Judgment Notwithstanding the Verdict or in the Alternative Motion to Amend Judgment. This motion was also denied by the court on December 22, 1978. This appeal and cross-appeal followed.

I.

At the outset, we take note of the fact that in this appeal, Mutual

Welding has not challenged the jury findings with regard to negligence or breach of warranty. Thus, appellee is entitled to recover damages under these alternative theories. The fact appellee can proceed and recover under these other theories does not undercut our ability to examine the application of the strict liability doctrine in this case. *Cf. Cox v. Shaffer,* 223 Pa. Super. 429, 302 A.2d 456 (1973) (pretrial dismissal of products liability theory not affect plaintiff's right to recovery under negligence cause of action); *Immergluck v. Ridgeview House Inc.,* 53 Ill. App.3d 472, 368 N.E.2d 803, 11 Ill. Dec. 252 (1977) (dismissal of strict liability action not affect other theories).

Turning now to appellant's first contention of error, Mutual Welding asserts that the doctrine of strict products liability should not have been applied to the instant case.

In *Stewart v. Budget Rent-A-Car Corp.,* 52 Haw. 71, 75, 470 P.2d 240, 243 (1970), the doctrine of strict liability in tort was adopted. We said:

> [W]e adopt the rule that one who sells or leases a defective product which is dangerous to the user or consumer or to his property is subject to liability for physical harm caused by the defective product to the ultimate user or consumer, or to his property, if (a) the seller or lessor is engaged in the business of selling or leasing such product, and (b) the product is expected to and does reach the user or consumer without substantial change in its condition after it is sold or leased. This is essentially the rule adopted in the *Second Restatement of Torts,* Section 402A.[2]

---

[2] Restatement (Second) of Torts, § 402A states:

§ 402A. *Special Liability of Seller of Product for Physical Harm to User or Consumer.*

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

In justifying the adoption of the above-stated rule, the *Stewart* court stated:

> The leading arguments for the adoption of a rule of strict products liability have been that the public interest in human life and safety requires the maximum possible protection that the law can muster against dangerous defects in products; that by placing the goods on the market the maker and those in the chain of distribution represent to the public that the products are suitable and safe for use; and that the burden of accidental injuries caused by defective chattels should be placed upon those in the chain of distribution as a cost of doing business and as an incentive to guard against such defects. [Footnote omitted.]

52 Haw. at 74-75, 470 P.2d at 243.[3] Thus, in order to prevail in a strict products liability case, it must be proved that "the product was someway defective and that the damages were caused by the defect."[4] *Stewart v. Budget Rent-A-Car Corp., supra,* at 75, 470 P.2d at 243; *Beerman v. Toro Manufacturing Corp.,* 1 Haw. App. 111, 615 P.2d 749 (1980).

## A.

In examining the applicability of the doctrine of strict products liability, our analysis must necessarily begin with a determination of whether a product is involved in this case.

Our decision in *Stewart* does not serve as a useful guide because that case did not define the term "product" for purposes of the application of the doctrine of strict liability. In *Stewart,* we found that an automobile was found to be a defective product whereby the doctrine was applicable. A recent decision of this Court, *Brown v. Clark Equip. Co.,* 62 Haw. 530, 618 P.2d 267 (1980), determined that

---

[3] *See* Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal. Rptr. 697, 377 P.2d 897 (1963).

[4] In applying the rule adopted in *Stewart,* the phrase "unreasonably dangerous" as found in the Restatement is not a necessary element of the cause of action. Brown v. Clark Equip. Co., 62 Haw. 530, 618 P.2d 267 (1980). We held that since *Stewart* did not adopt the literal definition of strict liability embodied in Section 402A, the instruction to the jury using comment I of Section 402A defining defective product was proper.

strict liability was applicable to a defective loader (truck).[5] Thus, we must turn to other resources to assist in our analysis.

An examination of the Restatement (Second) of Torts, § 402A which was essentially adopted in *Stewart* and the comments to that section will be a useful aid in our analysis. But the restatement and its comments leave undefined the term "product." Comment d which by no means is an exhaustive list provides various examples of products where the doctrine would apply. Comment d states:

> The rule stated in this Section is not limited to the sale of food for human consumption, or other products for intimate bodily use, although it will obviously include them. It extends to any product sold in the condition, or substantially the same condition, in which it is expected to reach the ultimate user or consumer. Thus the rule stated applied to an automobile, a tire, an airplane, a grinding wheel, a water heater, a gas stove, a power tool, a riveting machine, a chair and an insecticide. It applies also to products which, if they are defective, may be expected to and do cause only "physical harm" in the form of damage to the user's land or chattels, as in the case of animal food or a herbicide.

One court has held that failure to be included in the list of products set forth in comment d of Section 402A may be sufficient justification for the non-application of strict liability. *Lowrie v. City of Evanston*, 50 Ill. App.3d 376, 8 Ill., Dec. 537, 365 N.E.2d 923 (1977).

Other courts in trying to define whether something is a product under Section 402A have looked to the policy considerations underlying the strict liability doctrine. *Walker v. Shell Chemical Inc.*, 101 Ill. App.3d 880, 57 Ill. Dec. 263, 428 N.E.2d 943 (1981); *Moorman Manufacturing Co. v. Nat'l Tank Co.*, 92 Ill. App.3d 136, 47 Ill. Dec. 186, 428 N.E.2d 1302 (1980); *Anderson v. Farmers Hybrid Co. Inc.*, 87 Ill. App.3d 493, 42 Ill. Dec. 485, 408 N.E.2d 1194 (1980); *Heller v. Cadral Corp.*, 84 Ill. App.3d 677, 40 Ill. Dec. 387, 406 N.E.2d 88 (1980); *Dubin v. Michael Reese Hospital & Medical Ctr.*, 74 Ill. App.3d 932, 30 Ill. Dec. 552, 393 N.E.2d 588 (1979); *rev'd on other grounds*, 83 Ill.2d 277, 47 Ill. Dec. 345, 415 N.E.2d 350 (1980); *Immergluck v.*

---

[5] Strict liability has also been applied to products such as lawnmowers, Beerman v. Toro Manufacturing Corp., *supra;* and a washer and dryer, Boudreau v. General Electric Co., 2 Haw. App. 10, 625 P.2d 384 (1981).

*Ridgeview House, Inc.,* 53 Ill. App.3d 472, 11 Ill. Dec. 252, 368 N.E.2d 803 (1977); *Lowrie v. City of Evanston, supra; Housman v. C. A. Dawson & Co.,* 106 Ill. App.2d 225, 245 N.E.2d 886 (1969); *see generally, Note* "What is or is not a Product Within the Meaning of Section 402A," 57 Marq. L. Rev. 625 (1974). The court in *Lowrie* stated:

> [W]e are of the belief that the policy reasons underlying the strict products liability concept should be considered in determining whether something is a product within the meaning of its use in the Restatement rather than . . . to focus on the dictionary definition of the word.

50 Ill. App.3d at 383, 8 Ill. Dec. at 542, 365 N.E.2d at 928.

In further refining the definition of "product" expressed in *Lowrie,* the court in *Dubin v. Michael Reese Hospital & Medical Ctr., supra,* at 939, 30 Ill. Dec. at ____, 393 N.E.2d at 593 expressed the following:[6]

> Summarizing the definition of a product within the meaning of 402A as established by the foregoing cases, we find that a "product" with an unreasonably dangerous condition may subject those responsible for placing it in the stream of commerce to strict liability in tort may serve more than one purpose; may be unchanged from its natural state, viable, and not the result of a manufacturing process; must be of a fixed nature; and must be capable of being placed in the stream of commerce. Moreover, to satisfy the public policy reasons underlying the concept of strict liability in tort, we must also find that the "product" is something that may endanger human life and health; something whose intended use has been solicited and thought to be safe and suitable; and something that has reaped a profit for those placing it in the stream of commerce. Finally, we must consider the defendant's ability to distribute the risk of injury by passing the loss onto the public, and the injured party's difficulty in proving that the source of his injury was the defendant's negligence.

Another source of guidance can be found in the Model Uniform Product Liability Act published by the United States Department of

---

[6] Although the Illinois Supreme Court held that strict liability did not apply to X-radiation, the court did not reject the definition of a product as stated by the appellate court. Instead, the supreme court found that X-radiation was not defective in and of itself wherein strict liability does not apply.

Commerce. 44 Fed. Reg. 62714 (1979). Although this act does not have the force of law, its analysis can help shed light in our inquiry.[7] Section 102(C) of the Act defines product as follows at 62717:

"Product" means any object possessing intrinsic value, capable of delivery either as an assembled whole or as a component part or parts, and produced for introduction into trade or commerce. Human tissue and organs, including human blood and its components, are excluded from this term.

The analysis to this section provides an understanding of the act and it states in pertinent part at 62719:

"Product" means property which, as a component part or an assembled whole, is movable, and possesses intrinsic value. Therefore, included are all goods, wares, merchandise, and their components, as well as articles and commodities capable of delivery for introduction into trade or commerce.

\*  \*  \*  \*  \*

In a specific case, the particular product with which this Act is concerned is the "relevant product" which actually gave rise to the product liability claim. The "relevant product" may be the product as a whole or the particular component part or parts which gave rise to the product liability claim.

In order to cope with technological advances, we decline to establish a firm definition of "product" to which the doctrine of strict liability applies. Rather, a product should be determined on a case-by-case basis with that determination guided by the applicable case law, the public policy considerations underlying strict liability, the comments to the Restatement (Second) of Torts, and the Model Uniform Products Liability Act.

**B.**

Guided by the above considerations, we now must determine

---

[7] The uniform act states in pertinent part the following at 62716:

The principle purposes of the Act are to provide a fair balance of the interests of both product users and sellers and to eliminate existing confusion and uncertainty about their respective legal rights and obligations. The fulfillment of these goals should help, first, to assure that persons injured by unreasonably unsafe products will be adequately compensated for their injuries and, second, to make product liability insurance more widely available and affordable, with greater stability in rates and premiums.

whether a product was involved in the instant case to which the doctrine applies.

Milton Kaneko fell from a girt that gave way because the connecting clip to the column in this prefabricated mill building had been only tack welded.

The Restatement has not taken a position on whether Section 402A applies to the seller of a component part of a product to be assembled. *See* Caveat No. 3, Restatement (Second) of Torts, § 402A. However, comment q does make clear that if the component part is merely incorporated into something larger and there is no change in the component part itself, strict liability is applicable. Comment q, Restatement (Second) of Torts, § 402A.

A line of authority has held that a building is not a product within the meaning of Section 402A, Restatement (Second) of Torts. *See Heller v. Cadral Corp., supra; Immergluck v. Ridgeview House, Inc., supra; Lowrie v. City of Evanston, supra.*

The Illinois appellate court in *Lowrie* held that an open-air parking garage was not a product to which the doctrine of strict liability would apply. In spite of the public policy reasons underlying the doctrine, the court concluded that adequate remedies existed wherein it was unnecessary to further extend the doctrine. Further support for this conclusion was found by examining the intent of the framers of the Restatement. The *Lowrie* court observed:

> Moreover, we believe that the framers did not originally contemplate a structure such as a building to be a product. This is evident (a) from the fact that although comment d lists a number of products within the purview of § 402A, it does not include buildings; and (b) because the liability of builders is described and articulated in other sections of the Restatement, it appears to us that if structures and their builders were to be held to strict liability the framers of the Restatement would not have included the standard of care pertinent to builders, contractors and sellers of real property set forth in §§ 353, 385 and comment e of 389.

50 Ill. App.3d at 384-85, 8 Ill. Dec. at ____, 365 N.E.2d at 929. The court also concluded that the parking spaces which were part of the structure itself were not products contemplated by Section 402A.

Relying on *Lowrie,* the Illinois court also held in *Heller v. Cadral Corp., supra,* that a condominium, viewed in whole or in its component parts, was not a product as contemplated in strict products

liability. Accordingly, the court upheld the dismissal of that action.

Similarly, in *Immergluck v. Ridgeview House Inc., supra,* the court determined that a shelter-care facility was not a product within the meaning of Section 402A and held that an action under strict products liability was not maintainable.

Another line of cases presenting the alternative viewpoint is exemplified by *Lantis v. Astec Ind., Inc.,* 648 F.2d 1118 (7th Cir. 1982). In *Lantis,* the court, rejecting the argument that Section 402A does not apply to "assembly-type situations," held that a seller-manufacturer may be found strictly liable for injuries caused by a defective component part of an unassembled product. Astec Industries who was engaged in the business of designing, manufacturing and selling asphalt mixing plants entered into a contract to manufacture an asphalt mixing plant for E & B Paving Co. After fabrication, the plant, in its component parts, was shipped to the building site. While the plant was being erected, Edgar Lantis fell through an opening in the center of a service platform which resulted in his death. The Seventh Circuit concluded that because the component parts arrived without substantial change and its use was foreseeable and that no warnings were given with respect to the opening, plaintiff was entitled to go to the jury on the products liability theory and that the trial court erred in directing a verdict for defendant Astec on products liability.

Other courts have extended the doctrine of products liability to buildings or parts of buildings that were mass produced and contained a defective product. *See Schipper v. Leavitt & Sons, Inc.,* 44 N.J. 70, 207 A.2d 314 (1965); *Kriegler v. Eichler Homes, Inc.,* 269 Cal. App.2d 224, 74 Cal. Rptr. 749 (1969).

Upon consideration of these differing views, it is our opinion that a prefabricated building that must be assembled is a product where the seller-manufacturer may be found strictly liable for injuries caused by a defective component part. We agree with the conclusions of the *Lantis* court that strict liability applies to "assembly-type situations."

In addition, the public policy reasons expressed in *Stewart v. Budget Rent-A-Car Corp., supra,* would be reaffirmed in applying the doctrine here. Maximum protection to injured persons from defects in products would be provided. Furthermore, the manufacturer-seller, Mutual Welding, is best able to distribute the risk of injury for

distributing defective chattel as a cost of doing business. And finally, imposing the doctrine in this instance would serve as an incentive on the manufacturer to guard against such defects happening in the future.

Moreover, Comment d, Restatement (Second) of Torts cannot be read as being an exclusive list of products to which strict liability applies. As we acknowledged earlier, the enunciated list is not an exhaustive list of examples of products. We believe that given the technological advances being made, flexibility to respond to future developments is necessary.

## C.

Although we concluded that the prefabricated mill building was a product wherein the doctrine of strict liability was applicable, Mutual Welding contends that the rule should not be applied to the instant case. Mutual Welding argues that comment f to the Restatement (Second) of Torts, § 402A provides an exception for occasional sellers.

Comment f reads in pertinent part:

f. *Business of selling.* The rule stated in this Section applies to any person engaged in the business of selling products for use or consumption. It therefore applies to any manufacturer of such a product, to any wholesale or retail dealer or distributor, and to the operator of a restaurant. It is not necessary that the seller be engaged solely in the business of selling such products. Thus the rule applies to the owner of a motion picture theatre who sells popcorn or ice cream, either for consumption on the premises or in packages to be taken home.

The rule does not, however, apply to the occasional seller of food or other such products who is not engaged in that activity as a part of his business. Thus it does not apply to the housewife who, on one occasion, sells to her neighbor a jar of jam or a pound of sugar. Nor does it apply to the owner of an automobile who, on one occasion, sells it to his neighbor, or even sells it to a dealer in used cars, and this even though he is fully aware that the dealer plans to resell it. The basis for the rule is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings

with products which may endanger the safety of their persons and property, and the forced reliance upon that undertaking on the part of those who purchase such goods. This basis is lacking in the case of the ordinary individual who makes the isolated sale, and he is not liable to a third person, or even to his buyer, in the absence of his negligence. . . .

As evidenced by this comment, the occasional seller exception was not intended to apply to a manufacturer who is in the business of producing products. Rather, the exception applies to the ordinary person who enters into isolated sales of products. The underlying basis for applying the rule of strict liability does not exist and its application unwarranted.

In the instant case, it is undisputed that Mutual Welding was in the business of manufacturing and fabricating steel structures, and in erecting such structures. It is also beyond dispute that the instant building was fabricated by Mutual Welding. The fact that the mill building was erected by another company is irrelevant and does not relieve Mutual Welding of its responsibility to put a safe product which it produced into the stream of commerce. It cannot be said that this transaction was an isolated or one-time sale because Mutual Welding was in the business of fabricating steel buildings for erection by themselves or in sales to others. We conclude that the occasional seller exception as contemplated in comment f, Restatement (Second) of Torts is not applicable in this instance.[8]

## II.

We now turn to the principal issue raised in Kaneko's cross-appeal, that is, whether the doctrine of comparative negligence should merge with strict products liability.

As is evident from the vast amount of scholarly comment and case law, we are by no means the first to consider this issue. Other jurisdictions which have addressed the problem have reached varied conclusions on differing rationale.

---

[8] Although the sufficiency of evidence was not raised, we have carefully reviewed the record and find that there was sufficient evidence for the jury to conclude that Mutual Welding was strictly liable and that it placed a defective product into commerce.

Those who oppose the merger offer three basic arguments. They are that (1) strict products liability is a theory of liability not based upon negligence; therefore, negligence concepts like comparative negligence and contributory negligence are irrelevant, (2) if comparative negligence is merged with strict products liability, this will undercut a manufacturer's incentive to produce safe products, and (3) juries will be unable to compare the contributory negligence of a plaintiff with the defective product of a defendant.

The first objection of those in opposition to the merger of strict products liability and comparative negligence is that the two theories are incapable of being reconciled. They argue that there are both conceptual and semantic difficulties in bringing negligence and strict liability concepts together. "The task of merging the two concepts is said to be impossible, that 'apples and oranges' cannot be compared, that 'oil and water' do not mix, and that strict liability, which is not founded on negligence or fault, is inhospitable to comparative principles." *Daly v. General Motors Corp.*, 20 Cal.3d 725, 734, 575 P.2d 1162, 1167, 144 Cal. Rptr. 380, 385 (1978).

The Supreme Court of South Dakota, in denying that contributory negligence is a defense in strict products liability, stated in *Smith v. Smith*, 278 N.W.2d 155 (S.D. 1977), that

> Strict liability is an abandonment of the fault concept in product liability cases. No longer are damages to be borne by one who is culpable; rather they are borne by one who markets the defective product. The question of whether the manufacturer or seller is negligent is meaningless under such a concept; liability is imposed irrespectively of his negligence or freedom from it. Even though the manufacturer or seller is able to prove beyond all doubt that the defect was not the result of his negligence, it would avail him nothing. We believe it is inconsistent to hold that the user's negligence is material when the seller's is not. * * * We hold that the plaintiff's or the defendant's negligence is irrelevant and contributory negligence is not a defense in strict liability.

*Id.* at 160.

On the other hand, courts that favor the merger recognize the conceptual and semantic problems between the two principles, but find that they are not incompatible. *Pan-Alaska Fisheries, Inc. v. Marine Const. & Design Co.*, 565 F.2d 1129 (9th Cir. 1977); *Butaud v.*

*Suburban Marine & Sporting Goods, Inc.*, 555 P.2d 42 (Alaska 1976); *Daly, supra; Dippel v. Sciano*, 37 Wis.2d 443, 155 N.W.2d 55 (1967).

In a well reasoned opinion, the California Supreme Court in *Daly, supra,* held that comparative negligence should be merged with strict products liability. In holding so, that court recognized the theoretical and semantic difficulties between the two theories but refrained from holding that the concepts could not be merged. They argued that the theoretical and semantic difficulties exist because of the fixed and precise definitional treatment of legal concepts. They went on to say that products liability is an area where much overlapping and interweaving has developed in order to achieve substantial justice. That court reasoned that the merger of comparative negligence into strict products liability, notwithstanding the conceptual difficulties, will lead to more equitable results. The California Supreme Court's rationale can be summed up with their following statement: "Fixed semantic consistency at this point is less important than the attainment of a just and equitable result. The interweaving of concept and terminology in this area suggests a judicial posture that is flexible rather than doctrinaire." *Id.* at 734-36, 575 P.2d at 1168, 144 Cal. Rptr. at 385-86.

In short, those who oppose the merger believe that negligence and strict liability are different theories and therefore are not compatible. Those jurisdictions that are in favor of the merger argue that fairness and equity are more important than semantic consistency.

We believe that the better reasoned view is that comparative negligence is not incompatible with strict products liability. Our adoption of the theory of strict products liability was premised on equity and fairness and our concern for human safety. The interjection of comparative negligence into strict products liability will reduce an injured plaintiff's award by an amount equal to the degree to which he is culpably and contributorily negligent. Such a system will accomplish a fairer and more equitable result. We therefore reject the academic argument that the merger of the two concepts is prevented because of semantics. We find that fairness and equity are more important than conceptual and semantic consistency and hold that comparative negligence is not incompatible with strict products liability.

The second objection to the application of comparative prin-

ciples in strict products liability cases is that manufacturers will have less incentive to produce safe products. This was the view taken by Justice Mosk in his dissenting opinion in *Daly, supra,* in which he argued that reducing the size of the potential award will proportionately reduce the incentive to produce safe products. The majority, however, viewed the concern as "more shadow than substance." The majority supported their view with two points. First, a manufacturer cannot avoid liability merely because a plaintiff has contributed to his own injury. Secondly, the majority argued that a manufacturer cannot assume that the user of a defective product will be blame-worthy. Based on these two points, the majority held that "no substantial or significant impairment of the safety incentives of defendant will occur by the adoption of comparative negligence." *Id.* at 737, 575 P.2d at 1169, 144 Cal. Rptr. at 387.

We hold that the majority view in *Daly, supra,* is the better view in light of the fact that comparative negligence will only reduce the award and not the liability of a manufacturer of a defective product. Manufacturers will still be strictly liable. The only effect that comparative negligence will have in strict products liability will be to reduce the amount of an award by the degree to which a plaintiff is contributorily negligent.

The third major objection to the merger of the two theories is that it will present an impossible task for juries to reconcile the conduct of a plaintiff with the defective product of a defendant.

Some jurisdictions have refused to apply comparative negligence to strict products liability because of a fear of confusing the jury in allocating damages. *Melia v. Ford Motor Company,* 534 F.2d 795 (8th Cir. 1976); *Daly, supra* (dissenting opinion of Mosk, J.); *Smith, supra* at 161 n.7; Levine, *Strict Products Liability and Comparative Negligence: The Collision of Fault and No-Fault,* 14 San Diego L. Rev. 337 (1977).

In *Melia, supra,* the U.S. Circuit Court of Appeals held that "application of the Nebraska comparative negligence statute would, under the language of the statute, be extremely confusing and inappropriate in a strict liability case." *Id.* at 802. That court went on to say that the comparative negligence statute would only apply when plaintiff's negligence was slight as compared with defendant's negligence. And as such, the jury would be confused when applying the statute in strict products liability where negligence is not required.

On the other hand, those courts which have merged the two concepts are not persuaded by the argument that jurors would be unable to undertake a fair apportionment of liability. These courts observe that jurors have no difficulty in apportioning awards when using the maritime doctrine of unseaworthiness, a doctrine similar to strict liability, where plaintiff's misconduct is not an absolute bar to recovery, but may be considered in mitigation of damages as justice requires. *Pan-Alaska Fisheries, Inc., supra* at 1138; *Butaud, supra* at 45; *Daly, supra* at 738-39, 575 P.2d at 1170, 144 Cal. Rptr. at 388.

Other jurisdictions which have applied comparative negligence principles to strict products liability have dismissed this issue by simply holding that they find no difficulty for jurors if the two theories are merged.

We adopt the reasoning of the above-cited authorities and hold that jurors will not be confused in determining damages if comparative negligence is merged with strict products liability.

Finding that the major objections of those who oppose the merger of comparative negligence and strict products liability are not persuasive, we conclude that comparative negligence should be judicially merged with strict products liability.

Our holding is consistent with the basic policy underlying strict products liability, which is the manufacturers, although strictly liable for injuries from defective products, are not insurers of the safety of the products user. Strict products liability was never intended to be "absolute liability." *Daly, supra* at 733, 575 P.2d at 1166, 144 Cal. Rptr. at 384; *West Caterpillar Tractor Co.*, 336 So.2d 80, 90 (Fla. 1976); *Mulherin v. Ingersoll-Rand Co.*, 628 P.2d 1301, 1302 (Utah 1981).

In passing, we would like to note an anomaly that will be avoided by our merging the two concepts. This anomaly was addressed by the California Supreme Court in *Daly, supra,* which noted that when a products liability action is brought under the theory of negligence, where comparative negligence principles apply, contributory negligence of a plaintiff only diminishes but does not bar recovery. However, when the cause of action is brought under the theory of strict products liability, where comparative negligence principles traditionally played no part, assumption of the risk as a form of contributory negligence acts to completely bar recovery. This anomaly places a consumer plaintiff who sues in strict products liability in a worse position than if he had founded his case on simple

negligence. This situation, the California court reasoned, rewards adroit pleading and selection of theories. The court went on to say that adoption of comparative principles to strict products liability would eliminate this bizarre anomaly by equalizing the defenses to both negligence and strict products liability actions. In each instance, the defense, if established, will reduce but not bar plaintiff's claim. *Daly, supra* at 738, 575 P.2d at 1169, 144 Cal. Rptr. at 387-88.

We are persuaded by the *Daly* court's rationale. The adoption of comparative negligence in strict products liability will prevent an imbalance in the possibility of awards under negligence and strict products liability theories of recovery. By holding that the concepts are merged, we eliminate the harshness of the "all or nothing" bar to recovery that results if a plaintiff is found to have misused the product or to have assumed the risk of using the product.

The other specifications of error raised in the appeal and the cross-appeal are without merit. We decline to review the merits of the issues raised therein.

*James F. Ventura (Libkuman, Ventura, Moon & Ayabe,* of counsel) for defendant-appellant, cross-appellee.

*William S. Hunt (Hart, Leavitt, Hall & Hunt,* of counsel) for plaintiff-appellee, cross-appellant.

*James Krueger,* amicus curiae.