**WAILUA ASSOCIATES, Plaintiff,**

v.

**AETNA CASUALTY AND SURETY COMPANY, et al., Defendants.**

No. CIV. 94–00446 ACK.

United States District Court,
D. Hawaii.

Oct. 30, 1998.

David A. Nakashima, Alston Hunt Floyd & Ing, Paul Alston, David A. Nakashima, Alston Hunt Floyd & Ing, Honolulu, HI, Mark L. Tuft, Stephen D. Kaus, Cooper White & Cooper, San Francisco, CA, for Wailua Associates.

Dianne G. Jagmin, Case & Lynch, Paul A. Lynch, Lynch Ichida Thompson & Kim, Lyle M. Ishida, Tom & Petrus, Honolulu, HI, G. Edward Rudloff, Jr., Marjie D. Barrows, Gordon & Rees, Marjie D. Barrows, Rudloff Wood & Barrows, LLP, San Francisco, CA, for Aetna Casualty & Surety Co.

### ORDER: (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO STRIKE; (2) GRANTING DEFENDANTS' MOTION TO DISMISS; (3) GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

KAY, Chief Judge.

### BACKGROUND

On or about September 11, 1992, the Coco Palms Resort on the island of Kauai sustained damage as a result of Hurricane Iniki. The Coco Palms Resort is owned by Plaintiff Wailua Associates ("Wailua"). From November 1, 1991, through November 1, 1992, the Coco Palms Resort was insured by Defendants, Aetna Surety and Casualty Company ("Aetna") under a Custom Property Coverage Policy (the "Policy"). The Policy states that Defendants shall pay "for the direct physical loss of or damage to covered property caused by or resulting from a covered cause of loss." In addition to covering damage caused by Hurricane Iniki, the Policy provided coverage for the increased cost of repair or replacement caused by enforcement of ordinances and codes, e.g., Kauai Flood Plain Management Act, Ordinance 630 ("Ordinance 630").

After Hurricane Iniki, Plaintiff furnished Defendants with notice and proof of its losses. Defendants denied portions of Plaintiff's claim pertaining to: (1) coverage issues; (2) actual cash value ("ACV") of the Coco Palms Resort; (3) damages sustained by Hurricane Iniki; and (4) repair costs. On May 25, 1994,

Plaintiff, pursuant to the provisions of the Policy, demanded an appraisal to assess the property value and amount of loss. On the same day, Plaintiff filed suit against Defendants to enforce its demand. Plaintiff's complaint asserted claims for declaratory relief, breach of contract, tortious breach of contract, breach of the implied covenant of good faith and fair dealing, and punitive damages. Defendants' answer to Plaintiff's complaint alleged, inter alia, "comparative bad faith" as an affirmative defense.

On January 19, 1995, this Court ruled that the parties' appraisal agreement was an agreement to arbitrate covered by the Federal Arbitration Act ("FAA"). Therefore, the parties are entitled to a fundamentally fair hearing, i.e., the right to adequate notice and the opportunity to present evidence and arguments. *Wailua Assoc. v. The Aetna Casualty & Surety Co.*, 904 F.Supp. 1142, 1148 (D.Haw.1995) (*"Wailua I "*). With respect to the appraisal, this Court ruled that the "the panel is to determine the value of Coco Palms resort prior to the hurricane and the damage sustained by the resort as a result of the hurricane." *Id.* at 1149. The appraisal panel was further directed to consider Ordinance 630. *Id.*

The appraisal commenced in the spring of 1995 and concluded in the fall of 1996 with issuance of the final Award ("Award") on January 10, 1997. On September 26, 1997, the Court issued an Order Confirming Appraisal Award in its entirety.

Subsequently, Plaintiff filed a motion for partial summary judgment. Plaintiff sought to have the Court declare that all of the amounts determined by the Appraisal Panel for ACV, repair costs and costs of compliance with Ordinance 630 were covered by the Policy, and therefore represented the amounts owed to Plaintiff subject only to Defendants' mitigation defense. Shortly thereafter, Defendants filed their motion to strike and motion to dismiss, contending that the portions of Plaintiff's Second Amended Complaint ("SAC") pertaining to bad faith denial of insurance benefits were improper and should be stricken. Defendants addi-

tionally contended that Plaintiff's fourth amended claim for declaratory relief was hypothetical and speculative warranting dismissal for want of jurisdiction. On April 24, 1998, the Court issued an order denying Plaintiff's motion for partial summary judgment and granting in part Defendants' motions to strike and to dismiss. Plaintiff was granted leave to amend its Second Amended Complaint ("SAC").

On May 26, 1998, Plaintiff filed its Third Amended Complaint ("TAC"). On June 22, 1998, Defendants filed the instant motion to strike and motion to dismiss, claiming that Plaintiff's TAC contains inappropriate matter and fails to comply with the Court's previous Order. Plaintiff filed its opposition on September 25, 1998. On October 2, 1998, Defendants filed their reply.[1]

On August 26, 1998, Plaintiff filed a motion for partial summary judgment, claiming that "comparative bad faith," an affirmative defense claimed by Defendants, is not viable in Hawaii. Defendants filed their opposition to Plaintiff's motion on September 24, 1998. On October 2, 1998, Plaintiff filed its reply. The Court heard oral arguments on October 13, 1998.

### *STANDARD OF REVIEW*

**I.** *Motion to Strike*

Rule 12(f) states a court may strike from the pleading any redundant, immaterial, impertinent or scandalous matter. The rationale behind granting motions to strike is to "avoid ... prejudice to a party by preventing a jury from seeing the offensive matter or giving the allegation any unnecessary notoriety." 5A Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 1382, at 715 (2d ed.1990). An allegation is "impertinent" when it is irrelevant and could not be put into evidence between the parties. *See* 2A Moore's Federal Practice, ¶ 12.21[1]. Generally:

> Motions to strike allegedly redundant, immaterial, impertinent or scandalous matter are not favored. Matter will not be strick-

1. On October 5, 1998, Defendants filed a supplemental reply. However, the local rules do not provide for such a filing, and as such, that document is not considered by the Court here.

en from a pleading unless it is clear that it can have no possible bearing upon the subject matter of the litigation; if there is any doubt as to whether under any contingency the matter may raise an issue, the motion may be denied.... In suits involving multiple and complex issues, greater latitude in pleading may be allowed, since impertinence may not be so clear.

*Id.* at ¶ 12–207–08 (citations omitted); *see also Fantasy, Inc. v. Fogerty,* 984 F.2d 1524, 1527 (9th Cir.1993) (citing same), *rev'd on other grounds,* in 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994). Grounds for a motion to strike must be readily apparent from the face of the pleadings or from materials that may be judicially noticed. *See id.* at 1528. Similar to a motion for judgment on the pleadings, the court, in considering a motion to strike, views the challenged pleadings in the light most favorable to the plaintiffs. *See Hoeft v. Tucson Unified School Dist.,* 967 F.2d 1298, 1301 (9th Cir.1992) (regarding judgment on the pleadings).

## II. *Motion to Dismiss For Lack of Subject Matter Jurisdiction*

■ A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may either attack the allegations of the complaint or may be made as a "speaking motion" attacking the existence of subject matter jurisdiction in fact. *See Thornhill Publishing Co., Inc. v. Gen'l Tel. & Electronics . Corp.,* 594 F.2d 730, 733 (9th Cir.1979). Where the motion to dismiss is a "speaking motion," no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the existence of subject matter jurisdiction in fact. *See id.*

■ Pursuant to a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the Court may receive, among the forms of competent evidence, affidavits to resolve any factual dispute. *See Biotics Research Corp. v. Heckler,* 710 F.2d 1375, 1379 (9th Cir.1983); *National Expositions, Inc. v. Du-Bois,* 605 F.Supp. 1206, 1207–08 n. 2 (W.D.Pa.1985). The consideration of such evidence does not convert a motion to dis-

miss into one for summary judgment. *See id.* Moreover, the burden is on the plaintiff to prove, by affidavits or other evidence, that subject matter jurisdiction does in fact exist. *See id.; St. Clair v. City of Chico,* 880 F.2d 199, 201 (9th Cir.1989).

## III. *Motion for Partial Summary Judgment*

Summary judgment shall be granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). One of the principal purposes of the summary judgment procedure is to identify and dispose of factually unsupported claims and defenses. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The United States Supreme Court has declared that summary judgment must be granted against a party who fails to demonstrate facts to establish an element essential to his case where that party will bear the burden of proof of that essential element at trial. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. "If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact [citations omitted], the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment." *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987).

■ Rather, Rule 56(e) requires that the nonmoving party set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial. *See T.W. Elec. Serv.,* 809 F.2d at 630. At least some "significant probative evidence tending to support the complaint" must be produced. *Id.* Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment. *See British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir.1978).

The standard for a grant of summary judgment reflects the standard governing the grant of a directed verdict. *See Eisenberg v. Ins. Co. of North America,* 815 F.2d 1285, 1289 (9th Cir.1987) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, the question is whether "reasonable minds could differ as to the import of the evidence." *Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505.

The Ninth Circuit has established that "[n]o longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987). Moreover, the United States Supreme Court has stated that "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Indeed, "if the factual context makes the nonmoving party's claim *implausible,* that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Franciscan Ceramics,* 818 F.2d at 1468 (emphasis in original) (citing *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348). Of course, all evidence and inferences to be drawn therefrom must be construed in the light most favorable to the nonmoving party. *See T.W. Elec. Serv.,* 809 F.2d at 630–31.

## DISCUSSION

### I. *The Allegations in Paragraph 15*

In response to the Court's Order of April 24, 1998, Plaintiff filed its TAC. Defendants now allege that Plaintiff included language in Paragraph 15 of its TAC that is "redundant" and "scandalous," and have moved to strike this material. These issues will be addressed in turn.

### A. *Redundant Matter*

■ According to Rule 12(f) of the Federal Rules of Civil Procedure, the Court may strike redundant, immaterial, impertinent, and scandalous matter from a complaint. *See* F.R.C.P. 12(f). Motions to strike, however, are disfavored in the absence of prejudice. As the District Court of Hawaii has recognized, "[a] motion to strike is a severe measure and it is generally viewed with disfavor [and is] not normally granted unless prejudice would result to the movant from the denial of the motion." *United States v. 729,773 Acres of Land,* 531 F.Supp. 967, 971 (D.Haw.1982).

■ Defendants argue that Paragraph 15 of Plaintiff's TAC contains redundant language which should be stricken. Specifically, Paragraph 15 reads:

> 15. AETNA and its agents:
>
> (a) *unreasonably and improperly delayed and compounded the costs* of the Appraisal between AETNA and WAILUA so that the Appraisal *lasted longer and was more costly than reasonably necessary;* and
>
> (b) *more time-consuming and costly than reasonably necessary,* conducted themselves unreasonably, as if the Appraisal was siege warfare instead of an efficient means for assessing WAILUA'S property damage losses.

TAC, p. 7 (emphasis added).

Defendants' contention that subparagraph (a) is "redundant" is not entirely without merit. However, as noted above, the proper test to be applied by the Court is whether the redundant material results in prejudice to the opposing party. The latter portion of subparagraph (a) is simply a specific description of the allegation that Aetna "unreasonably and improperly delayed and compounded the cost of the Appraisal." While the two phrases are somewhat repetitive, inclusion of both does not place any undue emphasis on the assertions made therein. As such, the Court finds that the inclusion of both statements is non-prejudicial, and accordingly, Defendants motion to strike any portion of Paragraph 15(a) is DENIED.

■ By contrast, the Court finds that the phrase, "more time-consuming and costly

than reasonably necessary," which appears at the beginning of subparagraph (b), is both redundant and confusing. Although Plaintiff characterizes this as an "obvious" typographical error, the Court does not find that this is so. In fact, upon the Court's first reading of Plaintiff's TAC, it found subparagraph (b) to be both confusing and unclear. Furthermore, Plaintiff has conceded that the phrase was unintended and was included in error. Finally, the Court finds that Paragraph 15(b) simply repeats what was already alleged in Paragraph 15(a), and as such, is unnecessary. Thus, the Court finds that Paragraph 15(b) is redundant, and it is STRICKEN on that ground.

### B. *Scandalous Matter*

 Defendants also argue that Plaintiff's characterization of their conduct as "siege warfare" in Paragraph 15(b) constitutes "scandalous material" which should be stricken as well. In deciding a motion to strike scandalous material, the Court has wide discretion. *See Sur v. United States,* 167 F.2d 431 (9th Cir.1948).

Here, the term "siege warfare" is improper. While the Court is mindful of Plaintiff's intention to characterize Defendants' conduct in an accurate and appropriate way, the Court finds that such language is unnecessary. In its opposition to Defendants' motion, Plaintiff explains that "these allegations specifically relate to Aetna's deliberate and unreasonable attempts to frustrate the very purpose of the Policy's appraisal provision." By providing such an explanation, Plaintiff has demonstrated that it can communicate the same idea without using the phrase "siege warfare." The Court finds no reason why Plaintiff cannot do the same in its complaint.

Furthermore, Plaintiff's citation of one unpublished opinion which uses the phrase "siege warfare" does not change the Court's decision. Inclusion in one opinion does not constitute common usage by any means, and the Court is unpersuaded that such language is appropriate. Because the Court finds that Paragraph 15(b) is both scandalous and redundant, Paragraph 15(b) is hereby STRICKEN in its entirety from Plaintiff's TAC.

### II. *The New Allegations in Paragraph 11*

 Defendants next allege that Plaintiff abused its opportunity to amend Paragraph 15 pursuant to the Court's Order of April 24, 1998 by simply removing offending allegations from Paragraph 15 and re-inserting them in Paragraph 11. Before addressing this contention, the Court reviews the part of its April 24, 1998 Order which is relevant to this issue.

In the April 24, 1998 Order, the Court laid out the standard for a cause of action for bad faith in the insurance context. As the Court explained:

> the insured need not show a conscious awareness of wrongdoing or unjustifiable conduct, nor an evil motive or intent to harm the insured. An unreasonable delay in payment of benefits will warrant recovery for compensatory damages under the Gruenberg test. However, conduct based on an interpretation of the insurance contract that is reasonable does not constitute bad faith. In addition, an erroneous decision not to pay a claim for benefits due under a policy does not by itself justify an award of compensatory damages. Rather the decision not to pay a claim must be in "bad faith."

Order, p. 17, (*citing Best Place, Inc. v. Penn America Ins. Co.,* 82 Hawai'i 120, 920 P.2d 334, 347 (Haw.1996) (citations omitted)). Thus, the Court noted that although both parties were precluded from revisiting the findings of the Appraisal Panel, specifically the final computations or the underlying methodologies, they were not prevented from raising arguments relating to bad faith or improper conduct that allegedly occurred *during* the appraisal process. The Court held:

> In the spirit of the bad faith cause of action adopted in *Best Place,* the Court finds that in the context of the Appraisal, Wailua may attack Aetna's unreasonable delay: (1) from the time of Wailua's submitted claim to the initiation of the appraisal; (2) for the time during the appraisal; and (3) for the time between

confirmation of the Award and payment of the 1st period costs. All other allegations regarding the Appraisal, and Aetna's conduct therewith, are improper. [FN 5].

[FN 5] For example, Wailua may not challenge whether information submitted to the Appraisal Panel was relevant, properly within the panel's scope, inaccurate, etc. SAC ¶ 15, §§ (c), (d), (f).

Order, p. 20. Since the Court found that Paragraph 15 of Plaintiff's SAC was fraught with such improper references, Paragraph 15 was stricken, and Plaintiff was given 30 days leave to amend Paragraph 15 and replead its allegations regarding delay in insurance benefits to the extent permitted under *Best Place*.

In the instant motion, Defendants argue that Plaintiff did not replead its allegations as the Court directed in its previous Order. The Court disagrees with Defendants. In the previous Order, the Court held that Plaintiff could not base its bad faith claim on Defendants' non-delay-related conduct during the Appraisal process. Accordingly, the Court struck the allegations in Paragraph 15 because they were impermissibly linked to the Appraisal. The Court did not rule that the allegations in Paragraph 15 were improper *per se*, nor did it rule that Plaintiff could not fully state its bad faith claim against Defendants. In fact, the Order specifically states that Plaintiff may *"replead* its allegations regarding delay in insurance benefits to the extent permitted under *Best Place."* Order, p. 20. The fact that Plaintiff chose to re-plead these allegations in a different part of its complaint is immaterial. So long as Plaintiff complied with the Court's Order to remove allegations which improperly related to the Appraisal process, Plaintiff is entitled to plead its bad faith claims against Defendants as outlined in *Best Place.* Thus, Defendants' motion to strike the allegations now contained in Paragraph 11 of Plaintiff's TAC is DENIED.

### III. *The Allegations in Paragraph 21*

In its Order of April 24, 1998, the Court ordered Paragraph 21 of Plaintiff's SAC stricken and granted leave to amend that section. Specifically, the Court held:

> Although H.R.S. § 431:13–103 does not provide for a private cause of action, the insurance industry should not be encouraged to commit the types of unfair practices contained therein. Therefore, the Court finds that violations of the unfair settlement provision, § 431:13–103(a), may be used as evidence to indicate bad faith in accordance with the guidelines of *Best Place.* [FN 4] Accordingly, Wailua is permitted to construct allegations that mimic the requirements of § 431:13–103(a) referencing unreasonable delay. *As drafted, paragraph 21 of the SAC exceeds this scope. Accordingly, the Court strikes paragraph 21 of the SAC.* Wailua is given 30 days leave to amend paragraph 21 in accordance with the parameters outlined in this Order.

Order, p. 23 (emphasis added). Paragraph 21 of Plaintiff's SAC contained sixteen allegations. In its TAC, rather than attempt to narrow the scope of its allegations, Plaintiff re-pleaded, *verbatim,* the same sixteen allegations and added three more. By doing so, Plaintiff blatantly disregarded this Court's Order.

The Court has reviewed Paragraph 21 of Plaintiff's TAC and makes the following rulings:

1) The Court finds that Paragraphs 21(a)-(g), (i), (j), (q), and (r) comport with the statute. Therefore, these subparts shall remain intact, except as noted below.

2) Paragraph 21(h) is ordered STRICKEN because the Court finds that it fails to fall within § 431–103(a)(10)(I).

3) The phrase "and later mischaracterizing the purpose and intended uses of the payment" is STRICKEN from Paragraph 21(i) because it is excessive in scope.

4) Paragraph 21(k) and (1) are STRICKEN as redundant because the assertions contained therein have been pleaded elsewhere in Plaintiff's TAC.

5) Paragraph 21(m) is STRICKEN because it does not mimic any portion of § 431–103(a)(10).

6) Paragraph 21(n), (o), and (p) are STRICKEN as redundant because the assertions contained therein have been pleaded elsewhere in Plaintiff's TAC.

7) The Court finds that Paragraph 21(s), as pleaded, does not fully mimic the statute. Specifically, Paragraph 21(s) fails to incorporate the last clause of § 431:13–103(a)(10)(J), which reads, "by reference to written or printed advertising material accompanying or made part of an application." The Court GRANTS Plaintiff 30 days leave to amend Paragraph 21(s) to include this statutory language.

Based on the foregoing, Defendant's motion to strike the allegations contained in Paragraph 21 of Plaintiff's TAC is hereby GRANTED in part and DENIED in part.

## IV. *Plaintiff's Claims for Declaratory Relief*

Defendants' final contention is that Plaintiff's Fourth Claim for Relief, "Declaratory Relief as to Extra Expense Coverage and Repair Cost Coverage," should be dismissed for want of jurisdiction. Defendants claim that Plaintiff failed to amend this section in accordance with the Court's previous Order, and therefore, Plaintiff has failed to allege an injury sufficient to establish subject matter jurisdiction.

The Declaratory Judgment Act ("DJA") permits a federal court to "declare the rights and other legal relations" of parties to a "case of actual controversy." 28 U.S.C. § 2201 (1998). The line separating justiciable from non justiciable controversies escapes precise demarcation. As the United States Supreme Court has recognized, this is especially true when declaratory relief is sought:

> The difference between an abstract question and a 'controversy' contemplated by the [DJA] is necessarily one of degree, and it would be difficult, if it would be possible to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941). In other words, a case ripe for declaratory relief must present a "real and substantial controversy admitting of specific relief through a decree of conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241, 57 S.Ct. 461, 81 L.Ed. 617 (1937). Put another way, allegations of injury must be "sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage." *Burlington Northern R.R. Co. v. Crow Tribal Council*, 940 F.2d 1239, 1243 (9th Cir.1991). The Ninth Circuit has found that "a dispute between an insurer and its insureds over the duties imposed by an insurance contract satisfies Article III's case and controversy requirement." *GEICO v. Dizol*, 133 F.3d 1220, 1222 (9th Cir.1998) (insurer had standing to proceed where question existed as to whether insurer had duty to pay estate of insured's deceased brother). However, the above cases demonstrate that this is not absolute. Plaintiff's Fourth Claim for Relief, as pleaded in its TAC, demonstrates this as well.

Although it is understandable that Plaintiff wishes to seek clarification as to its coverage under the policy, the fact remains that it continues to allege hypotheticals in its complaint. In its SAC, Plaintiff stated, "Wailua believes it has rights Aetna will not acknowledge under the policy *in the event Wailua chooses to buy or build other property* to replace the lost and damaged insured property." SAC, ¶ 34, p. 12 (emphasis added). In its previous Order, the Court concluded that such language "expressly connoted an attenuated hypothetical for which Wailua was impermissibly seeking an advisory opinion." Order, p. 26. The Court granted leave to amend the complaint.

█ Plaintiff's amended claims fail for the same reason. Paragraph 34 of Plaintiff's TAC states:

In Wailua's view, Aetna's obligations include, but are not limited to:

1) paying Wailua the sum needed to comply with the FPM law *when* Wailua acquires replacement property of like kind and quality at another location, *as it contemplates doing* because the insurance proceeds are inadequate to rebuild the Hotel;

TAC, at 12. Plaintiff continues to speak in hypothetical terms.

To support its contention that Paragraph 34, as amended, complies with the DJA, Plaintiff points to the Court's previous Order. In its SAC, Plaintiff requested that the Court declare its rights under the policy with regard to "extra expense." In the April 24, 1998 Order, the Court held that this was a "clearly defined question." What Plaintiff fails to recognize is that this question was clearly defined because Plaintiff had *made a claim* for extra expense coverage. By contrast, Plaintiff has never made a claim for replacement cost or functional replacement cost coverage. Plaintiff merely "contemplates" doing so, according to the TAC. Since Plaintiff has not yet made a claim for these benefits, the question of coverage is not a clearly defined question. That is why, as before, the TAC still asks the Court to determine Defendants' obligations based on a series of hypothetical situations that may never materialize, i.e., the extent of Defendants' obligations *if* Plaintiff buys replacement property, *if* Plaintiff chooses not to buy replacement property, etc. Thus, even if the Court declared Plaintiff's rights with regard to this coverage, such a declaration would only be of value *if and only if* Plaintiff then chose to acquire replacement property.

On this issue, *Polaroid Corporation v. Berkey Photo, Inc.*, 425 F.Supp. 605 (D.Del. 1976), is illustrative. In that case, the defendant sought a declaratory judgment to determine whether it was permitted to use plaintiff's trademark, as it *contemplated* doing. *See id.* at 608. In denying the defendant's request, the district court held:

although [defendant's] arguments in support of the alleged presence of a justiciable controversy are superficially appealing, its averments that it "*contemplates* using and needs to use the term Polaroid" fall far short of allegations of a substantial dispute between the parties.... [defendant] has not even alleged any facts regarding its plans, nebulous or certain as they may be, which would inform the Court of the substance and scope of its intentions."

*Id.* (emphasis added). Similarly, Wailua's statement in Paragraph 34 that it "contemplates" acquiring replacement property falls short of the DJA's requirements. The Court finds that the language "as it contemplates doing" expressly connotes an attenuated hypothetical for which Plaintiff, as before, is impermissibly seeking an advisory opinion. Accordingly, the Court GRANTS Defendants' motion to dismiss Paragraph 34.

As to Paragraph 35(b), although it does not expressly state "as it contemplates doing," the Court interprets Paragraph 35(b) as if it did contain such language, since it is necessarily linked to Paragraph 34. Accordingly, the Court further GRANTS Defendants' motion to dismiss Paragraph 35(b). In the event Plaintiff does make a good faith claim for replacement cost in the future, thereby creating an actual case or controversy, it is not precluded from filing an action for declaratory judgment on this issue.

## V. *Motion For Partial Summary Judgment*

█ One of the claims in Plaintiff's complaint is that Defendants breached the implied covenant of good faith and fair dealing. Thus, Plaintiff seeks a determination in this case that Defendants are liable to them for the tort of bad faith. In their answer, Defendants respond by alleging that Plaintiff also acted in bad faith, and that their liability should thus be reduced accordingly. Specifically, Defendants pleaded the affirmative defense of "comparative bad faith." In the instant motion, Plaintiff moves for partial summary judgment, claiming that such affirmative defenses are not viable under Hawaii law. Defendants argue to the contrary, contending that, although this is admittedly a

question of first impression in Hawaii, it is clear that Hawaii courts would indeed recognize such defenses.

In deciding this issue, the Court's discretion is not unlimited. In a diversity action, the Court must apply the substantive law of the forum state by looking to decisions of the state's highest court. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In the absence of controlling forum state law, a federal court sitting in diversity may make its own determination of what the State's highest court decision would be after considering relevant state court authority. *See Takahashi v. Loomis Armored Car Ser.*, 625 F.2d 314, 316 (9th Cir.1980).

As noted by the parties, the issue in the instant motion is one of first impression in Hawaii, and as such, there is no Hawaii law which directly addresses this issue. However, the Hawaii Supreme Court's decision in *Best Place*, 82 Hawai'i at 120, 920 P.2d 334 is relevant to this issue, and thus, the Court's decision must be consistent with that opinion. In light of *Best Place*, the Court holds that comparative bad faith is not a viable affirmative defense in Hawaii in insurance cases.

## A. *Inequality Between Insurer and Insured*

In *Best Place*, the Hawaii Supreme Court recognized that "every contract contains an implied covenant of good faith and fair dealing that neither party will do anything that will deprive the other of the benefits of the agreement." 82 Hawai'i at 123–24, 920 P.2d 334. The court noted that, although a breach of this duty normally gives rise to an action in contract, it may give rise to an action in tort, depending upon the duties inherent in a particular type of contract. *Id.* at 129, 920 P.2d 334. The court held that the unique nature of an insurance contract warranted such an exception, allowing the imposition of tort liability on an insurer who breaches the implied covenant of good faith and fair dealing. *Id.* at 127–28, 920 P.2d 334.

The court's decision was based upon a number of factors unique to the insurer-insured relationship. First, the insurer-insured relationship "is characterized by elements of public interest, adhesion, and fidu-

ciary responsibility." *Id.* at 128, 920 P.2d 334 (*citing Seaman's Direct Buying Service Inc. v. Standard Oil Co. of Cal.*, 36 Cal.3d 752, 206 Cal.Rptr. 354, 686 P.2d 1158 (1984)). "The special relationship between insurer and insured is ... atypical, and the adhesionary aspects of an insurance contract further justify the availability of a tort recovery." *Id.* at 132, 920 P.2d 334.

Second, since an insurance policy is not obtained for commercial advantage, but, instead, for protection and security against economic catastrophe, the insured is often in an especially vulnerable economic position when a loss occurs. *See id.* at 128–29, 920 P.2d 334. Consequently, the whole purpose of insurance is defeated if an insurance company can merely refuse or fail, without justification, to pay a valid claim. *See id.*

Third, the insurer-insured relationship is one with inequality of bargaining power, and the insurer receives both premium and control. *See id.* The Supreme Court explained:

> In first-party situations the insurer sets the conditions for both presentment and payment of claims.... [t]he contract and the nature of the relationship effectively give the insurer an almost adjudicatory responsibility. The insurer evaluates the claim, determines whether it falls within the coverage provided, assesses its monetary value, decides on its validity and passes upon payment.

*Id.* at 130, 920 P.2d 334.

Finally, the imposition of tort liability on the insurer is necessary to provide the necessary compensation to the insured. *See id.* at 132, 920 P.2d 334. "Without the threat of tort action, insurance companies have little incentive to promptly pay proceeds rightfully due to their insureds, as they stand to lose very little by delaying payment." *Id.*

In light of these considerations, the Supreme Court held that "there is a legal duty, implied in [an] insurance contract, that the insurer must act in good faith in dealing with its insured, and a breach of that duty of good faith gives rise to an independent tort cause of action." *Id.* at 132, 920 P.2d 334.

Defendants argue that the Supreme Court did not decide that an insured's breach is not subject to reciprocal tort liability. While that issue was not before it in *Best Place,* the Supreme Court's opinion in *Best Place* nevertheless makes clear that it is the inequality between the insurer and the insured which gives rise to the insurer's "heightened duty." Consequently, the insured may recover for the insurer's bad faith in tort as well as contract, while the insurer, by contrast, has no such tort remedy.

In light of *Best Place,* this Court rejects the affirmative defense of comparative bad faith in the insurance context. To hold otherwise would be to contradict *Best Place. Best Place* recognized that the insurer-insured relationship is inherently unequal, and therefore created a "one-sided" tort to offset that inequality. To attempt to equalize that tort by comparing an insurer's bad faith with an insured's would disrupt the equality that *Best Place* sought to achieve. Furthermore, putting an insured on equal footing with an insurer would undermine the *Best Place* court's expressed concerns and elaborate discussion regarding the differences between the two.[2] In fact, during the hearing in the instant motion, Defendants' attorney acknowledged that the tort of bad faith was created because of the difference in position between an insured and an insurer.

The California Court of Appeals recognized this difference in *Kransco v. American Empire Surplus Lines Ins. Co.,* 63 Cal. Rptr.2d 532 (1997), *review granted,* 67 Cal. Rptr.2d 167, 942 P.2d 414 (1997). In that case, the court stated:

2. It appears from the facts of *Best Place* that the Hawaii Supreme Court would have entered into an analysis of comparative bad faith if it felt that the defense was viable in Hawaii. In *Best Place,* the insured operated a bar/nightclub which was destroyed in a fire. 82 Hawai'i at 123, 920 P.2d 334. Because the circumstances surrounding the fire were suspect, the insurer requested that the insured submit to an examination under oath, and submit a complete "Proof of Loss" form as mandated under the policy. *See id.* The insured failed to submit to the examination and did not turn over the requested documents. *Id.* Consequently, the insurer refused to act on the insured's demand for payment on the policy. *See id.* Notwithstanding the conduct of the insured in *Best Place,* the court did not address the defense of comparative bad faith at all.

In fact, it is an insurer's breach of the covenant of good faith that is governed by tort principles, at least as concerns damages. An insured's breach of the covenant is not a tort. An insurer's tort liability is predicated upon special factors inapplicable to the insured.

*Id.*

The rejection of comparative bad faith does not mean that an insurer will be held liable for delays which it did not cause, or other conduct which was not undertaken in bad faith. Rather, the Court's holding means that if an insurer acts in bad faith, it is liable in tort, and the fact that the insured simultaneously acted in bad faith will not reduce or relieve this liability, although it may give rise to a contractual or equitable defense, or may disprove the insurer's bad faith entirely.[3]

### B. *The Insurer's Duty to Act in Good Faith is Absolute*

*Best Place* also held that the insurer's duty of good faith and fair dealing is "unconditional and independent of the performance of [the insured's] contractual obligations." *Id.* at 128, 920 P.2d 334. According to the court, "insurance companies owe an *absolute duty* of good faith and fair dealing to their insureds." *Id.* (emphasis added). To permit an insurer's breach of this duty to be simply offset by the conduct of the insured directly contradicts this notion of absolute duty.

3. Defendants argue that since Hawaii courts have recognized that the doctrines of tort and contract overlap in certain contexts, the Court should not reject comparative bad faith merely because an insured's bad faith gives rise to an action in contract and the insurer's bad faith gives rise to an action in tort. However, the Court's rejection of comparative bad faith is not based upon the mere distinction between tort and contract. Rather, the Court's decision, as noted above, is based on the Hawaii Supreme Court's express finding in *Best Place* that because the relationship between an insurer and insured is inherently unequal, tort liability exists for the former, but not the latter.

The Court's rejection of comparative bad faith based on absolute duty is also consistent with other Hawaii law. In *Kaneko v. Hilo Coast Processing*, 65 Haw. 447, 654 P.2d 343 (1982), at issue before the court was whether the doctrine of comparative negligence should be applied in strict products liability cases. The *Kaneko* court found that comparative negligence was not incompatible with strict products liability. Although Defendants cite *Kaneko* as support for the notion of comparative bad faith in the insurance context, *Kaneko* actually supports the position taken by the Court today. While the *Kaneko* court stated that comparative negligence could be applied in strict liability actions, the basis of its decision is reflected in the following quote from the opinion:

> Our holding is consistent with the basic policy underlying strict products liability, which is that manufacturers, although strictly liable for injuries from defective products, are not insurers of the safety of the product's user. Strict products liability was never intended to be "absolute liability."

*Id.* at 353. As noted above, *Best Place* held that an insurer's duty to act in good faith *is* absolute.

Furthermore, application of comparative negligence in *Kaneko* avoided the possibility that the injured party would be completely barred from recovery if they were at all negligent. *Id.* at 354. Prior to the *Kaneko* decision, a consumer's contributory negligence in the strict products liability context would completely bar any recovery against the manufacturer. The *Kaneko* court rejected contributory negligence and adopted comparative negligence, creating the possibility that the consumer might recover at least some measure of damages. *See id.* Here, on the other hand, applying comparative bad faith would reduce the amount that an insured would otherwise recover. Thus, *Kaneko* does not support the application of comparative bad faith in this context. However, it is important to note that rejection of comparative bad faith does not leave an insurer entirely without remedies, as discussed below.

### C. *Other Remedies*

Defendants argue that the rejection of comparative bad faith would mean a return to an "all or nothing" fault system. The Court disagrees. "Rejection of comparative bad faith does not leave the insurer without redress for an insured's misconduct." *Kransco*, 63 Cal.Rptr.2d at 532. "An insured's misconduct may disprove the insurer's liability for bad faith, or may provide grounds for contractual and equitable defenses." *Id.* Thus, the Court finds that the rejection of the affirmative defense of comparative bad faith in the insurance context does not leave an insurer without remedies for an insured's bad faith conduct.

### D. *Other Jurisdictions Reject Comparative Bad Faith*

Recognizing that insureds are not liable in tort for breaches of the implied covenant of good faith and fair dealing, a number of courts in other jurisdictions have rejected the defense of comparative bad faith in the insurance context. Like the Hawaii Supreme Court in *Best Place*, these courts emphasized that insurers have special responsibilities that subject them, but not insureds, to tort liability for bad faith.[4]

For example, in *Stephens v. Safeco Ins. Co. of America*, 258 Mont. 142, 852 P.2d 565 (Mont.1993), the Montana Supreme Court rejected the defense of comparative bad faith in the insurance context. In that case, the jury found that both the insurer and insured acted in bad faith, and apportioned fault between them. *See id.* at 567. The Supreme Court reversed, holding that the insurer's bad faith conduct was a cognizable tort, while the insured's bad faith conduct was only a breach of contract. *See id.* at 567–68. According to the court, "the insurer occupies the superior bargaining position and the insured in the inferior, [and][t]here is a great

4. The Court is not suggesting that case law from other jurisdictions is binding authority in the instant case, nor is the Court asserting that comparative bad faith has never been recognized in the insurance context. However, because the Court agrees with the reasoning in cases which have rejected these defenses, three of these cases are briefly discussed here.

disparity between the economic positions of the parties to a contract of insurance." *Id.* at 568. The court reasoned that the special relationship between an insurer and insured warranted the imposition of tort liability on the insurer for bad faith. *See id.* According to the court, "[t]he tort of bad faith ... serves to discourage oppression in contracts which necessarily give one party a superior position. The insurer, in the superior position, is therefore liable in tort whereas there is no fear that the insured will harm the insurer to such an extent." *Id.* (citations omitted).

Similarly, in *Stumpf v. Continental Cas. Co.,* 102 Or.App. 302, 794 P.2d 1228 (Or.App. 1990), the Oregon Court of Appeals rejected the defense of comparative bad faith. In *Stumpf,* the insurer argued that it should have been permitted at trial to assert the affirmative defense of comparative fault. *See id.* at 1232. The court rejected this argument, holding that an insured does not owe a duty of "due care" toward its insurer. *Id.* at 1233. According to the court:

> Because [t]he right of the insurer to control the defense of the litigation carries with it the duty to exercise diligence and care toward the insured, [the insurer] had a contractual responsibility to perform its duty to defend with due care. With respect to [the insured's] duties, ... [n]owhere does it impose on him a general duty of due care toward the insurer. Indeed, it would be nonsensical to hold that an insured who has bargained away control of his own case nevertheless may be liable for conducting it negligently. [The insured's] alleged comparative negligence is not relevant to the contractual liability of [the insurer].

*Id.* (quotations and citations omitted).

Finally, in *Kransco,* the California Court of Appeal rejected the comparative bad faith defense. 63 Cal.Rptr.2d at 532. In *Kransco,* the insurer argued on appeal that the trial court should have recognized the affirmative defense of comparative bad faith. *See id.* The court disagreed, noting that no state supreme court has embraced comparative bad faith, and "the weight of authority is against it." *Id.* It emphasized that "[a]n

insurer's tort liability is predicated upon special factors inapplicable to the insured." *Id.* By contrast, "[a]n insured's breach of the covenant is not a tort." *Id.* The court reasoned that "[t]he doctrine of comparative bad faith thus sets an insurer's tortious breach of the covenant against the insured's contractual breach of the covenant, even though contractual breaches do not implicate fault and are generally excluded from comparative fault allocations." *Id.*

The *Kransco* court reasoned that the differing obligations of the insurer and insured render any comparison of fault meaningless:

> The doctrine of comparative bad faith is marked by inconsistencies and complexities in application because it is founded on the faulty premise that the obligations of insurer and insured-and thus their bad faith-are comparable. They are not. The parties are bound by a reciprocal obligation of good faith and fair dealing, but the particular duties differ given the differing performance due under the contract of insurance. A fundamental disparity exists between the insured, which performs its basic duty of paying the policy premium at the outset, and the insurer, which hopes never to perform its basic duties of defense and indemnification.

*Id.*

The court emphasized, however, that the "rejection of comparative bad faith does not leave the insurer without redress for an insured's misconduct." *Id.* For example, "[a]n insured's misconduct may disprove the insurer's liability for bad faith, or may provide grounds for contractual and equitable defenses. The insured's breach of the covenant of good faith and fair dealing is also actionable as a contract claim." *Id.* (citations omitted).

### E. *California Case Law*

To support their contention that Hawaii should recognize the defense of comparative bad faith, Defendants assert that it is logical to conclude that the Hawaii Supreme Court would look to California law. The Court recognizes that the Hawaii Supreme Court has, in the past, looked to California for guidance. In fact, the Hawaii Supreme

Court relied heavily on *Gruenberg v. Aetna Insurance Company*, 9 Cal.3d 566, 108 Cal. Rptr. 480, 510 P.2d 1032 (1973), when it recognized the tort of insurer bad faith in *Best Place.*

However, since the California Supreme Court has yet to rule in this area, the issue of comparative bad faith is far from settled in California. Thus, any guidance from California must be sought from the courts of appeals. In this vein, the Court finds *Kransco* persuasive. However, Defendants argue that since review has been granted by the California Supreme Court in *Kransco,* it cannot be cited as controlling authority in California. *See* Cal. R. Ct. 976(d). Notwithstanding *Kransco*'s status in California, what Defendants fail to mention is that no California cases are binding on Hawaii courts, regardless of their status. On the other hand, Hawaii courts may properly consider *all* California cases, including *Kransco,* as persuasive authority. Furthermore, the Hawaii Supreme Court has cited California cases which were up on review in its opinions. *See e.g., Sentinel Ins. Co. v. First Ins. Co. of Hawaii,* 76 Hawai'i 277, 300–01, 875 P.2d 894 (1994) (citing two California cases on review); *State v. Kupau,* 76 Hawai'i 387, 395, 879 P.2d 492 (1994).[5]

Defendants argue that the Court should follow the reasoning of *California Casualty Gen'l Ins. Co. v. Superior Court of San Bernardino County,* 173 Cal.App.3d 274, 218 Cal.Rptr. 817 (1985), which recognized the defense of comparative bad faith. However, the Court finds it compelling that the Hawaii Supreme Court did not mention *California Casualty* in its opinion, yet it relied upon *Gruenberg,* 9 Cal.3d at 566, 108 Cal.Rptr. 480, 510 P.2d 1032, a much older California case, for the proposition that an insurer's duty to the insured is unconditional. Furthermore, as discussed above, the concept of an insurer's unconditional duty to the insured is inconsistent with the notion of comparative bad faith. In other words, *California Casualty* does not appear to be consistent with *Gruenberg.*

Judge Marcus M. Kaufman, the author of *California Casualty,* attempted to reconcile the two cases in a recent article. He states:

> At first blush, [the notion of comparative bad faith] seems inconsistent with the statement in Gruenberg that the insurer's duty of good faith is unconditional and independent of the performance of plaintiff's contractual obligation. But Gruenberg was decided in 1973, before the comparative fault doctrine was recognized in California and therefore should not be regarded as foreclosing this defense.

Cal. Prac. Guide Ins. Lit. Ch. 12D–B (1997). However, the Hawaii Supreme Court in 1996 nonetheless decided to follow *Gruenberg* and did not even mention *California Casualty* or the comparative bad faith defense. Thus, it appears that the Hawaii Supreme Court, like this Court, was not persuaded that comparative bad faith is a viable defense in the insurance context.

In light of *Best Place,* the Court finds that the affirmative defense of comparative bad faith is not viable in Hawaii.

### CONCLUSION

For the foregoing reasons, the Court hereby GRANTS in part and DENIES in part Defendants' motion to strike. The Court further GRANTS Defendants' motion to dismiss. Finally, the Court GRANTS Plaintiff's motion for partial summary judgment.

IT IS SO ORDERED.

---

**5.** Defendants also argue that *Kransco* is distinguishable from the instant case because *Kransco* dealt with a third-party insurance claim. However, in *Best Place,* the Hawaii Supreme Court recognized that the tort of bad faith applies in both the first- and third-party contexts. *See Best Place,* 82 Hawai'i at 127–30, 920 P.2d 334. Indeed, the Hawaii Supreme Court first pointed out that in the landmark *Gruenberg* case, California extended the tort of bad faith in the third-party context to the first-party situation. The Hawaii Supreme Court concluded its analysis of the similarity of the two by observing that "[i]n both first- and third-party situations the contract and the nature of the relationship effectively give the insurer an almost adjudicatory responsibility." *Id.* at 130, 920 P.2d 334. Thus, the Court finds no reason to distinguish between first and third-party claims in its comparative bad faith analysis.